For the record, Jonathan Libby here, and on behalf of Alejandro Melchor Gutierrez. Did you want me to cover both of the next two cases now? Might as well, because they seem quite similar. Certainly, and also on behalf of Oriol Cardenas. Yeah, we might as well, yes. So that gets us to the question I first asked you. I had the wrong case in front of me. It was Gutierrez, so you don't have an objection here, right? That's correct. There was not objection in either of these other two cases. And what does that put us? It means that the Court is reviewing the breach argument for plain error. And there are a couple of 930 cases that have addressed the plain error analysis. In Whitney, Whitney was a plain error case, and the Court found that the breach was such, caused a sufficient amount of prejudice that... Well, in Whitney there was actually a suggestion of, I mean, it was an actual breach, wasn't it? That's right. I mean, first the Court has to find whether or not there was a breach in these cases. And then if there's a breach, then the Court has to determine whether or not the defendants... In that case, these cases are a bit different from Heredia. I mean, Heredia was a very strong language. I don't want to call it extreme, but the language here is much less so, or less so in any event. And we're judging it by, I guess the standard is, you know, would the judge, looking at this language and knowing what the agreement was, have sort of realized, oh, this is improper, I need to give up the case having read this? Right. So the first issue that the Court needs to determine in both of these two cases is whether or not what took place, in fact, was a breach. Now, in the Melchor... And we could say there was a breach. I'm not sure how we're going to rule, but one could say there was a breach in Heredia and say there was not a breach here because the language is just so different. That's true. Because the factual circumstances are different in the three cases. In Melchor Gutierrez, there we have a situation where in the sensing position that the government filed, it discussed, again, goes through and detailed the defendant's criminal history. It does not contain the disparaging comments that you had in Morales in the first part of its sensing position. There, it just discusses how the defendant is a danger to the community in the supervised release section. But in Melchor Gutierrez, we also have, during the sentencing hearing, the U.S. attorney also argued right before the Court was about to impose sentence that commented how defendant has immediately come back after both of his deportations and that defendant's criminal behavior is escalating, given the horrific nature of his 2009 conviction for assault with a deadly weapon. So here, at the sentencing hearing, the government is, again, highlighting very negative facts about the defendant. Well, he actually uses that word, doesn't he? That's right. I just want to highlight. He uses it twice. And he also brings in new information. I mean, my issue with the next two cases is that it's plain error review. Right. But this case, Melchor Gutierrez, is probably more egregious than Cardenas. But they're both plain error review. Correct. And so looking at the plain error review, the issue, was there a breach? That deals with its first two prongs of plain error. The last prong, what this Court has said with respect to whether it affects the fairness, integrity, or public reputation. Well, I'm sorry. Let's go back to the ‑‑ there are two components to the breach aspect of it. If a judge makes a mistake of law, we sort of presume that the judge knows the law because it's in the law, and we all presume everybody knows the law. But this is in a plea agreement. There's a specific, very specialized language in a plea agreement. If nobody brings it to the judge's attention to say, hey, Your Honor, look, this is what they promised and this is what they said, we can sort of look at what they said and we say, well, the judge is aware of those things. But how do we know that ‑‑ how can we impute to the judge the knowledge of the very precise words in the plea agreement? Because, again, Your Honor, I think what we're ‑‑ this is a somewhat different situation than we typically deal with because it's, again, it's not the judge who's being reviewed at this point and being criticized. It's the government. But if it's the judge, because I asked you that question the last time. What was the judge supposed to do if the answer is the judge was supposed to send it to a different judge? That's right. If an objection. So how can he do that, you know, if it's ‑‑ you know, if, I mean, God forbid, if a U.S. attorney says something erased, you know, something like that, you know, just jumps out at you. But I'm just sitting here thinking of being a district judge. I don't know that district judges read every word of a plea agreement or are required to. I mean, it's not like a plea sentence report where you're supposed to read the whole thing beginning to end. There's lots of stuff in the plea agreement that judges don't need to bother to read. And I don't disagree with you, Judge Picencio. So how do we attribute this to Judge Anderson? I mean, he gets it back. Let's say we were to reverse him. He'd say, well, how can you expect me? What am I, a mind reader? Well, and again, that's right. Yes, technically we are reversing the judgments, and the judgment came from Judge Anderson. But we're not reviewing Judge Anderson for wrongdoing, so to speak. But you are. Because plain error says the judge should have interposed the objection and either stopped it or said I've been poisoned. Okay? And so that's the problem. So can you bring me to the agreement and say when Judge Anderson was reading this agreement, when would it have occurred to him that the government had breached it? Well, with respect, Your Honor, I don't think we in fact, based on my reading of the case law, is that we look to see whether Judge Anderson should have seen it. The issue is whether the breach existed and whether it is clear from the record that the breach existed. And that's what this Court does. But where did the breach occur? Where in this document, in the sentencing memo, did the breach occur? Well, the breach occurred in Melchor Gutierrez when the government detailed again the defendant's criminal history, which was already before the Court, and when it was. All right. So just, I've got the agreement in front of me. So tell me what should, what is the breaching language? This is a contract, okay? Right. So generally, you know, it's helpful to, when you have a breach of contract, to point out specifics where it was breached. And so where did they go astray? Well, and as with the last case, it's the same paragraph because we're dealing with the same plea agreements. No, we're not. No, we're not. We're saying defendant's criminal history. You're saying that they can't mention that criminal history then? Well, this is where we get back to what this Court said in Whitney. I'm asking what you are contending here in this precise language. Yes. You know, these abstractions don't help. I'd like to look at the contract and tell me where the breach occurs in the language that's been presented to the judge. Okay. And now tell me. Obviously, we're dealing with the government, cannot suggest in any way. In any way. Right. All right. I know we focused on that. So looking at the document, I'm looking at ER 42 in the background. The government is unnecessarily detailing the defendant's criminal history, which is already before the Court. Okay, so that's at line 20. That's correct. Well, that's this promotion. Where in the criminal history do they go beyond the pale? Where's the breach? Discussing what this Court said in Whitney and what this Court said in Mondragon is that when it's not necessary, when the facts are already before the Court, such as the defendant's criminal history. All right. That it is improper. This is the language. No matter how benign it may be, George, it's repetitive of what's in the PSR. That's right. If it's repeating the PSR, that's a breach. That's the rule you want. That's part of it, yes, because there's no need for the government to do that. Okay. Later on in this particular sentencing position, on page 45 of the excerpt. Okay. In this case, defendant has been convicted of a crime of violence. Thus, defendant poses a danger to the community, which warrants imposition of supervised release. Okay. By saying that defendant poses a danger to the community, that is a disparaging comment on the defendant that clearly the judge is seeing and could have an effect. And even though the guideline commentary says don't impose supervised release. That's right. This is still what the judge should rely upon is the pure stipulation, and that's enough. That is correct, Your Honor. And then in addition, in this case, in Melcher's case, as I noted, at the sentencing hearing itself, on page 14 of the excerpts. Yes. He's immediately come back. Criminal behavior is escalating. Horrific nature. Right. And this is just before the court rules. So immediately before the court is about to impose sentence, these are comments that the government makes, and then instead of imposing sentence, the court says, well, now I'm going to reject the plea agreement. Okay. All right. And I do believe in this case you're then attacking the supervised release proviso, not as applied by the judge? That argument was included in this brief. Yes, Your Honor. I did not prepare this brief. But, yes, that argument was raised. Yes. Absolutely. Therefore, validating the government's argument that if the judge decides on his own for uninfluenced by the sentencing memorandum, with all of the information you suggest being taken out, decides not to impose supervised release, then they lose the benefit of the bargain that they won. Well, I believe the argument we're making in both of these cases on that point is that the court failed to justify imposition because it didn't give any explanation. Yes. Now, yes, the government did. And the government would have been, you know, given the opportunity at that point to give a justification. That's right. And that's another thing. The government says it needs to present all of these things affirmatively to the court. And, again, there's not. If the court has questions about whether or not it's going to, in fact, agree to the agreement, the court can ask questions. And in response, there's nothing wrong to the government responding to questions so long as it doesn't breach the agreement there, but. Wait, wait, wait, wait, wait. Okay. Let's get the sequencing here. The judge is asking questions, and the judge says, I don't see the justification  I'm a new judge here in town. And I don't know what all my colleagues do. And I don't know about these fast-track agreements. So the government says, well, Your Honor, defendant has been convicted of a crime of violence, and he poses a danger to the community. Is that a breach? I still think that's a breach because that's a characterization that the government does not need to make. What the government can present is that we believe, the parties jointly believe, that three years of supervision is appropriate in this case, and then give the reasons the government gives, aside from the disparaging comments about the defendant's background. The government then goes on to explain, you know, we would like to be able to monitor him. If he stays in the country, if he leaves the country and comes back, we want to be able to deal with that situation as a violation. Those are all legitimate reasons why you might want to impose a term of supervision. But as I said, you know, the government keeps stressing it's the maximum term of supervision. It's the standard term of supervision that's imposed in these cases. All right? It's not unusual. And again, the parties agree to it. And I can't imagine a court suddenly saying, well, no, no, no, that's too much supervision that the parties have agreed to. I just don't think that's realistic, Your Honor. The point is that the commentary says don't impose it. Well, it recommends. Recommends. I understand. Well, based on various scenarios, there's a scenario with the court and what it discusses. I know. Right. Okay. All right. Now, with respect to the breach in Cardenas, there, again, the government details the defendant's criminal history, deportations, including spending time discussing his juvenile justifications. It then goes on to discuss how he's a danger to community because he is a gang member or that he associates with gang members. Now, it's not entirely clear if the government is actually – I mean, the government seems to be making the argument he's a gang member. Now, the present report says just the opposite. But the government is now making the – taking the position he's a gang member, and therefore he poses a danger to the community. That, again, is a characterization, and I believe a mischaracterization of the record that, again, resulted in the court rejecting the plea agreement. Now, if I could just say the – because we're dealing with clean air reviews, so whether or not it affected substantial rights. In Gonzales-Aguilar, the court found substantial rights were not violated and talked about how, because all of these things were in the pre-sentence report and the court expressly discussed how it relied on the pre-sentence report, therefore, there was no prejudice, because it's not likely it would have affected the court, because the court made very clear it relied primarily on the pre-sentence report. In these two cases, in Melchor Gutierrez and in Cordenas, the court, Judge Anderson makes no reference to the pre-sentence report when he rejects the plea agreement. The court says in both cases, I've considered the plea agreement, I've considered the guidelines, I've considered the parties sentencing the Miranda, and based on that, I'm rejecting the plea agreement. It makes no reference to the pre-sentence report. But he does refer to the defendant's criminal history, and he could only get that from the pre-sentence report. Well, in fact, not here, Your Honor, because the government so extensively detailed the defendant's criminal history in its sentencing positions. So, in fact, you know, the fact that the government included all of that information means the court didn't have to rely on the pre-sentence report at all. It could have, in fact, simply relied on the sentencing memo and the government's characterization of the defendants in that memo, those memos. So that's where we believe this is closer to Whitney and not Consuelos. Ginsburg. Did he say that he read the no, in, okay, I'm looking at Melcor, the court says that he's received, read, and considered the pre-sentence report. He says that. So why shouldn't we, and he also says, by the way, that he reviewed the plea agreement. So why shouldn't we take his words at face value and assume he's read both? Well, I don't think, I think we should assume the court did, in fact, review the pre-sentence report. The court's obligated to read the pre-sentence report, and the court said he read the pre-sentence report. And that he read the plea agreement and then was aware of the decision regarding the government's sentencing recommendation. Right. So when the court is giving its actual explanation for why it's rejecting the plea agreement, the court says, I reviewed the agreement to make the determination. I've considered the facts in terms of the plea agreement, the guidelines, the defendant's criminal history, his history of illegal reentries, the memorandum submitted by parties, and statutory goals of sentencing. No mention of the pre-sentence report there. And so this is just in terms of prejudice and whether or not there was prejudice. What the court relied on in Gonzales was the fact that the court made very clear it relied almost exclusively on the pre-sentence report, so the government's memorandum couldn't have made a difference. Whereas here, the court, in fact, doesn't reference it in explaining why the court rejected. The plea rights. Okay, thank you. So unless the court has additional questions. We'll hear from the government. Thanks. Good morning again, Your Honors. Ashley All for the United States. Just to start with where we left off, Gonzales-Aguilar is not distinguishable. In both of these cases, at ER 14, before rejecting the plea agreement, the district court adopted the findings and guidelines calculations of the PSR. It's at the very bottom of ER 14 in the first case and in the middle on the second case. Gonzales-Aguilar found no prejudice. I think the court could resolve this case under any of the prongs of plain error. I think there are cases, various cases in this district. Excuse me, that's a misreading of what the judge said. What the judge said was the court adopts the factual findings in the guideline application set forth in the pre-sentence report. Yes, Your Honor. In the guideline application. So what he's accepting is how the, not, I mean, he's not adopting everything in the pre-sentence report. Oh, I see, because he says in the guideline. Yeah, so you can adopt the pre-sentence report. Yes. Or you can adopt parts of the pre-sentence report. Yes. And that's the judge's role. Yeah, I think the point to be made with regard to Gonzales-Aguilar is that the court did reference the pre-sentence report, specifically here in reference to determining the guidelines range, and in addition to having referenced all the other materials he considered. I mean, part of the, I think the core of the argument being made about breach is that these facts were already in the PSR. I think that fact, to the extent it helps at all in establishing a breach, under plain error review, under Gonzales-Aguilar, cuts against the finding of prejudice because the facts were already there. I don't think it goes to the breach so much as it goes to the remedy under plain error review, whether substantial rights are affected. Under Gonzales-Aguilar, that's right, Your Honor. Under Gonzales-Aguilar, I think it indicates that if it's apparent the court has considered other materials, in that case the PSR, such that the government sentencing recommendation was not the sole basis for finding these things, then there can be no prejudice. And a point that I started to make in regards to the first case, but which was accurately stated as not strictly being relevant there, I think the breach in these cases, at a minimum, can't be obvious when looking at the course of conduct between both parties. In both cases here, defendants submitted a lengthy and substantive sentencing recommendation that argued for the sentence based on mitigation factors. And I think it's no surprise that defendants tend to say, to emphasize mitigation factors, and the government may tend to argue for aggravating factors. But in any case, both parties submitted materials to the district court that argued based on 3553A factors. I think any breach can't be obvious, given that factual circumstance. If the court has no... Does the defendant make a promise, or is it just the prosecution? It's both parties, Your Honor. Both parties agree to not suggest, seek, or recommend? Yes. And I don't think the point is that I'm not contending that the defendant was breaching. I think the point is that the party's understanding of this agreement, which ultimately is relevant under contract law, indicates that both parties were substantively recommend, not just emptily recommend, the sentence that was stipulated to in the agreement. And in these two cases, that's exactly what happens. Okay. Thank you. Thank you, Your Honors. Cases just argued will stand submitted.
judges: Kozinski, Wardlaw, Fisher